**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| |
|---|
| JOHN J. CLAY, JR.,<br> *Plaintiff*,<br><br>v.<br><br>FGO LOGISTICS, INC., COSTCO WHOLESALE<br>CORPORATION, and CHRISTOPHER SOLDI,<br> *Defendants*. |

No. 3:23-cv-01575-MPS

**RULING ON MOTION TO COMPEL ARBITRATION**

## I.    INTRODUCTION

Plaintiff John Clay, Jr. brought this action against Defendants FGO Delivers, LLC ("FGO"),[1] Costco Wholesale Corporation ("Costco"), and Christopher Soldi alleging that he was sexually harassed, racially discriminated against, and terminated from his position in retaliation for his complaints about Defendants' harassment and discrimination. Defendants moved to compel arbitration, arguing that Clay signed a valid arbitration agreement when he was hired by FGO's affiliate, and that the agreement is enforceable under both state and federal law. For the reasons explained below, I deny Defendants' motions to compel arbitration without prejudice.

## II.    FACTS

### A.  Factual Background

The following facts are drawn from the complaint, along with the exhibits attached to the parties' briefs, and for the purposes of this ruling, I treat them as undisputed unless otherwise indicated.

---

[1] According to FGO, it was improperly named "FGO Logistics, Inc." in Clay's complaint. ECF No. 33 at 1.

1

1.  **The Parties**

FGO is a "[f]inal [m]ile delivery solution for furniture, appliances and electronics in the United States," ECF No. 1-1 ¶ 7, meaning it "operates a fleet of trucks that pick[] up goods from [large retail businesses'] warehouse[s] and delivers such goods to the homes of customers who have ordered the[m]."  ECF No. 29 ¶ 5.  "It maintains a fleet of over 500 vehicles[,] which complete approximately 3,400 deliveries every day."  *Id.*  FGO is a wholly-owned subsidiary of Need It Now Delivers, LLC ("NIND").  *Id.* ¶¶ 2, 12; ECF No. 23-1 ¶ 1.

Costco is "an American multinational corporation[,] which operates a chain of membership-only big-box retail stores."  ECF No. 1-1 ¶ 8.  Costco is one of FGO's clients.  *Id.* ¶ 15.

Clay, a Connecticut resident, is a "Black man of African American heritage."  ECF No. 1-1 ¶ 1.  He was hired as a Dispatcher at Expressway Courier & Freight, LLC ("Expressway")— another wholly-owned subsidiary of NIND—in 2019.  *Id.* ¶ 11; ECF No. 23-1 ¶ 3; ECF No. 29 ¶ 3.  He was promoted to the position of Account Manager at Expressway in 2020.  *Id.* ¶ 8.  In either August 2020 or 2021,[2] he was transferred from Expressway to FGO, ECF No. 1-1 ¶ 14; ECF No. 23-1 ¶ 6l; ECF No. 29 ¶ 4, and on October 29, 2021, he was promoted to the position of General Manager of Logistics at FGO, ECF No. 1-1 ¶¶ 14-15; ECF No. 29 ¶ 9.  I

In all these roles, Clay was "responsible for the interstate delivery of goods in Connecticut, Massachusetts, and western New York."  ECF No. 29 ¶¶ 7-9.  Clay was also responsible for managing FGO's Costco account.  ECF No. 1-1 ¶¶ 15-16.

---

[2] Clay has made inconsistent statements regarding when he was transferred to FGO.  ECF No. 1-1 ¶ 14; ECF No. 29 ¶ 4.

### 2.  **Alleged Harassment**

Because Clay managed FGO's Costco account, he worked with and for Defendant Soldi, who until November 4, 2021 worked as a Costco Warehouse Manager.  ECF No. 1-1 ¶¶ 16, 16.47.  Clay contends that Soldi "used his position and authority over [him] to taunt, harass, bully, and terrorize [him]," and details in his complaint numerous examples of racist and sexual remarks made by Soldi to Clay and his colleagues.  *Id.* ¶ 16.

Clay alleges that he reported Soldi's conduct on several occasions.  For example, on August 19, 2021, he told Joe Haight—who at the time was serving as FGO's Senior Vice President and Clay's direct supervisor, *id.* ¶ 12—"that we need to watch Chris Soldi because he says some 'sus stuff' (suspicious stuff)."  *Id.* ¶ 16.2.  On the same day, Clay had a phone call with Haight and his colleague, Abel Ceballo, "to brief Mr. Haight and FGO about how uncomfortable Mr. Soldi of Costco ha[d] made the work environment."  *Id.*; *see also id.* at ¶¶ 16.3, 16.17.

On October 14, Clay and Ceballo spoke to Jodi Thompson, a Costco Warehouse Supervisor, about Soldi's mistreatment.  *Id.* ¶ 16.18.  She told them to "report him," but otherwise did nothing to help him.  *Id.*  On the same day, Clay told Haight that Soldi "was trying to manipulate [Clay] into becoming the General Manager" and that he was "nervous about having to report to Chris Soldi" if he took that role.  *Id.*  Haight told him that he "ha[d] to accept the promotion…and report directly to Chris Soldi because [FGO's president] want[ed] to please Chris Soldi."  *Id.*

Clay also sent Haight screenshots of inappropriate messages Soldi sent him and Ceballo.  *See, e.g., id.* ¶¶ 16.12, 16.14, 16.22.  For example, on October 18, Clay sent Haight "screenshots

of some of the uncomfortable sexual comments Chris Soldi made toward the Plaintiff," but Haight "did nothing about it."  *Id.* ¶ 16.22.

Clay alleges that Haight not only failed to redress Soldi's misconduct but also himself made inappropriate remarks to Clay.  For example, on October 15, Haight "made a gay joke about the Plaintiff taking it from behind."  *Id.* ¶ 16.19.  And when Clay informed Haight that Soldi had made a joke about him being a "slave," Haight responded: "[w]e're all slaves to our customers."  *Id.* ¶ 16.28.

Clay nonetheless continued to raise his concerns with Haight and others.  For example, on November 2, he told Haight that he was "extremely stressed from the hostile office atmosphere."  *Id.* ¶ 16.41.  The following day, Soldi "sent the Plaintiff extremely inappropriate pictures and notes," and "made inappropriate comments to the Plaintff about [a female coworker]."  *Id.* ¶ 16.44.  Thompson "admitted to knowing about [this]."  *Id.*  That same day, Clay sent Haight "a video of…inappropriate racial comments Chris Soldi made to" him and Ceballo.  *Id.* ¶ 16.45.

Costco fired Soldi on November 4, 2021, *id.* ¶ 16.47, but Soldi continued to send Clay harassing and threatening text messages, *id.* ¶¶ 16.48, 16.50.  On November 26, Clay told Haight that he was concerned that Soldi might try to "get retribution" by using his friendship with FGO's president to cause Clay to lose his job.  *Id.* ¶ 16.49.  The last harassing text message that Clay alleges he received from Soldi was sent on November 30.  *Id.* ¶¶ 16.50.

### 3.  **Alleged Retaliation**

Clay alleges that on March 18, 2022, FGO posted two positions on the job search website, Indeed: "one for a General Manager for Costco, and one for a General Manager for Nestle, each at a salary of $70,000."  *Id.* ¶ 16.51.  Clay asked his manager about these postings

and complained that he was underpaid because he made $70,000 and managed both of these accounts. *Id.*  His manager told him that the listings were a "mistake" and that FGO would take them down that day. *Id.*  As of March 29, both postings were still listed on Indeed. *Id.* ¶ 16.52. As of April 9, the Nestle posting had been deleted but the Costco posting was still listed. *Id.* ¶ 16.53.

On April 29, 2022, Clay was terminated from his employment with FGO Logistics. *Id.* ¶ 19.  FGO said that his termination was due to Clay's dress code violations, "unaccounted time spent away from the client with unknown whereabouts," and lack of preparation during conference calls. *Id.*  Clay alleges that these reasons were "pretext to terminate [him] in retaliation for complaining about the racial and sexual harassment he experienced," as well as for complaining about being undercompensated. *Id.*

### 4.  <u>Arbitration Agreement</u>

According to FGO, Clay was presented with and signed a three-page arbitration agreement in connection with his employment at Expressway.  ECF No. 23-1 ¶¶ 3-4.  Clay contends that he "do[es] not remember receiving or signing any arbitration agreement when [he] started working for Expressway," ECF No. 29 ¶ 14, and "do[es] not recall sending any documents back to [Expressway]," ECF No. 29 ¶ 19.  But he admits that "when he started with [Expressway], [his] manager asked [him] to sign something." *Id.* ¶¶ 15-16.  Clay admits that he signed this document but says that he did so without reading it; he also avers that no one told him he was signing an arbitration agreement, and that "[i]f anyone had told [him] the implications of signing [an arbitration] agreement, [he] would not have signed it." *Id.* ¶¶ 16-18.

FGO has produced copies of the first and third pages of the agreement Clay signed, but admits that "our copy is missing the second page."  ECF No. 23-1 ¶ 4; *see* ECF No. 23-2 at 2-3.

The first page specifies that the agreement applies "to any dispute brought by either Employee or Employer arising out of or related to the Employee's employment with Employer ("Employment") or Employee's relationship, including termination of the relationship, with Employer and/or Employer's clients, officers, directors, agents, parents, principals, subsidiaries, affiliates, other employees, contractors and representatives, and all of their respective successors and assigns." *Id.* at 2.  It further specifies that it is "intended broadly to apply to all covered claims,…subject to the exclusions in Section 1(A)(ii)." *Id.*  Section 1(A)(ii) does not appear on pages one or three of the agreement. *Id.* at 2-3.

The third page reflects Clay's printed name and signature. *Id.* at 3.  It also contains the following "Governing Law" provision:

> This Arbitration Agreement shall be governed by the Federal Arbitration Act, 9 U.S.C. §1, et seq., to the extent it is applicable and otherwise this Arbitration Agreement and the rights of the parties hereunder shall be governed by and construed in accordance with the laws of the state where Employee is or was employed by Employer, exclusive of conflict or choice of law rules.

*Id.* at 3.  And, in bold, capitalized letters immediately above Clay's signature, it states:

> EMPLOYER AND EMPLOYEE HAVE EACH READ, BEEN PROVIDED WITH A REASONABLE TIME TO REVIEW, AND UNDERSTAND THIS AGREEMENT, AND UNDERSTAND THAT THIS AGREEMENT TO BINDING ARBITRATION CONSTITUTES A WAIVER OF TRIAL BEFORE JUDGE OR JURY AND WAIVER OF PARTICIPATION IN CLASS, COLLECTIVE, CONSOLIDATED OR REPRESENTATIVE ACTIONS.

*Id.*

Though FGO has been unable to produce the second page of Clay's arbitration agreement, it has submitted a declaration from Barrett Wolf, the manager of both Expressway and FGO at the relevant times, stating that, at the time Clay was hired, all Expressway employees were "presented with and required to sign" an arbitration agreement and that "[t]he

provisions of the[se] arbitration agreements were identical."  ECF No. 23-1 ¶ 3.  Attached to the declaration are "three examples of the full agreements signed at that time by Expressway employees."  *Id.* ¶ 5; *see* ECF No. 23-3 at 2-10.  These three examples are identical to one another, and the first and third pages are identical to the first and third pages of Clay's agreement.  *See id.*; ECF No. 23-2 at 2-3.  The declaration further states that the agreement that was provided to Clay contained the same second page as the one contained within these examples.  ECF No. 23-1 ¶ 5.  These second pages contain Section 1(A)(ii), which reads as follows:

> Nothing in this Agreement prohibits Employee from filing a charge, testifying, assisting, or participating in any manner in an investigation, hearing, or proceeding before any government agency, but Employee waives any right to any form of recovery, compensation or other remedy in any action brought by Employee or on Employee's behalf based on a covered claim.

ECF No. 23-3 at 3, 6, 9.

### B.  Procedural Background

Clay filed his complaint on November 1, 2023 in Connecticut superior court.  ECF No. 1-1 at 2, 4.  His complaint raises the following claims against all Defendants: hostile work environment under Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(b); sexual harassment under CFEPA, *id.* § 46a-60(b)(8); and intentional infliction of emotional distress.  ECF No. 1-1.  He also brings the following claims against FGO alone: wrongful termination on the basis of color under CFEPA, *id.* § 46a-60(b)(1); wrongful termination on the basis of race under CFEPA, *id.* § 46a-60(b)(1); retaliation for opposing discriminatory conduct under CFEPA, *id.* § 46a-60(b)(4); and wrongful termination on the basis of race under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.  ECF No. 1-1.

Defendants removed Plaintiff's case from the Connecticut superior court to this Court on December 1.  ECF No. 1.

On January 8, 2024, Defendants filed the pending motions to compel arbitration.  ECF No. 23; ECF No. 24; ECF No. 25.  Clay filed a response, ECF No. 28, and Defendants filed replies, ECF No. 32; ECF No. 33; ECF No. 35.  Clay later moved for leave to file a sur-reply. ECF No. 36.  I denied this motion, explaining that I would "not consider any arguments raise for the first time in Defendants' reply briefs."  ECF No. 38.

The parties' filed a joint motion to stay discovery pending the Court's ruling on the motions to compel arbitration, ECF No. 22, which I granted, ECF No. 37.  I later partially lifted this stay, however, because "[u]pon a preliminary review, it appear[ed] that the motions to compel arbitration may turn on factual issues that the parties ha[d] not yet had the opportunity to develop in discovery."  ECF No. 39.  I allowed "the Defendants to take a deposition of Plaintiff and…[the Plaintiff] to depose a single witness of either an employee of one of the Defendants or a Rule 30(b)(6) representative of one of the corporate defendants."  *Id.*  I also directed the parties to file supplemental memoranda.  *Id.*

Defendants submitted supplemental memoranda in accordance with my order.  ECF No. 46; ECF No. 47; No. 48.  Clay did not.  Instead, he moved for a 21-day extension to respond to these briefs.  ECF No. 49.  I granted a 14-day extension, ECF No. 50, which Defendants moved to set aside on the grounds that it would "afford[] [Clay] the sole final word regarding arbitrability and deprive[] Defendants of any chance to respond to Plaintiff's supplemental arguments."  ECF No. 51 at 2.  I denied Defendants' motion but allowed them to file a reply to Plaintiff's response.  ECF No. 52.  Plaintiff filed his response and then Defendants filed their replies.  ECF Nos. 54-56, 59-60, 62.

On August 14, 2024, after the Second Circuit's ruling in *Olivieri v. Stifle, Nicolaus &* *Co., Inc.,* 112 F.4th 74 (2d Cir. 2024), I invited the parties to file supplemental briefs addressing "how [*Olivieri*] supports or does not support the arguments already made by the parties in this case," regarding the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (the "EFAA"). *Id.* On August 23, the parties submitted their supplemental briefs regarding the *Olivieri* decision. ECF No. 57; ECF No. 58; ECF No. 61; ECF No. 63.

## III. LEGAL STANDARDS

"In deciding motions to stay or compel arbitration, courts apply a standard similar to that applicable for a motion for summary judgment." *Boroditskiy v. Eur. Specialties LLC*, 314 F. Supp. 3d 487, 492 (S.D.N.Y. 2018) (internal quotations marks omitted). That standard requires this Court to "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with…affidavits" and "draw all reasonable inferences in favor of the non-moving party." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (internal quotation marks omitted). But where the "undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, we may rule on the basis of that legal issue and avoid the need for further court proceedings." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (internal quotation marks omitted).

## IV. DISCUSSION

The parties contest (1) whether a valid arbitration agreement was formed; (2) whether an exemption in the Federal Arbitration Act (the "FAA") makes that statute inapplicable, and, if so, whether Connecticut law nonetheless requires arbitration; and (3) whether the EFAA exempts

the parties' dispute from arbitration.  As explained below, I conclude that the parties formed a valid arbitration agreement that is enforceable under Connecticut law—regardless of whether the FAA applies—but that the parties' dispute is exempt from arbitration at Clay's election under the EFAA.

### A.  Contract Formation

Connecticut law governs the question of contract formation in this case.  The FAA does not speak to contract formation and simply requires that arbitration agreements be enforced to the same extent as other contracts.  *See Monisoff v. Am. Eagle Inv., Inc*., No. 96-cv-7798, 1996 WL 708598, at *1 (2d Cir. Dec. 9, 1996) ("[A] court first must conclude that the parties intended to arbitrate in the first instance before the scope of arbitration [under the FAA] may be defined." (internal quotations and alterations omitted)); *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) ("Because an agreement to arbitrate is a creature of contract,…the ultimate question of whether the parties agreed to arbitrate is determined by state law.").

Under Connecticut law, "an agreement must be definite and certain as to its terms and requirements.  So long as any essential matters are left open for further consideration, the contract is not complete."  *Geary v. Wentworth Lab'ys, Inc.*, 60 Conn. App. 622, 627 (2000) (alterations and internal quotation marks omitted).  "A court may, however, enforce an agreement if the missing terms can be ascertained, either from the express terms or by fair implication."  *Id.* at 627-28 (internal quotation marks omitted).

Clay contends that Defendants cannot meet their burden of proving the existence of an arbitration agreement under Connecticut law because they cannot produce the second page of the agreement.  He relies primarily on *Dreyfuss v. E-Telecare Global Solutions-US., Inc.*, 349 F. App'x 551 (2d Cir. 2009).  In *Dreyfuss*, the defendant sought to compel arbitration based upon an agreement that the plaintiff signed as a condition of his employment.  *Id.* at 552.  But the

defendant was unable to locate a complete copy of the arbitration agreement. *Id.* It could locate only the last page, which was signed by the plaintiff, and "the first page of an arbitration agreement which contain[ed] a fax line indicating that it was sent from [the plaintiff]." *Id.* Over the course of discovery, the defendant "was able to produce at least three types of documents containing arbitration agreements, which had been signed by…employees during the period of [the plaintiff's] employment, *but no single standard document* containing an arbitration clause." *Id.* at 552-53 (emphasis added). Further, discovery revealed that "the majority of Defendant's employees did not sign arbitration agreements" at all. *Dreyfuss v. eTelecare Glob. Sols.-US, Inc.*, No. 08-cv-1115, 2008 WL 4974864 , at *8 (S.D.N.Y. Nov. 19, 2008). The district court had concluded that the "demonstrable differences among the several agreements in the record established that [the defendant] ha[d] not met its burden of proving the existence of a valid arbitration agreement between itself and [the plaintiff]." *Dreyfuss*, 349 F. App'x at 553 (internal quotation marks omitted). The Second Circuit declined to remand to allow the parties to offer testimony about the missing page because the defendant had made no offer of proof and ultimately affirmed. *Id.* at 554. The court explained that because the defendant could not demonstrate the plaintiff's "assent to an entire range of matters relevant to the conduct of arbitration proceedings," it could not "meet its burden of showing that the meeting of the minds necessary for the existence of an enforceable contract took place." *Id.*

Here, as in *Dreyfuss*, Defendants have produced only two pages of the parties' purported arbitration agreement. ECF No. 23-1 ¶ 4; *see* ECF No. 23-2 at 2-3. The first page makes clear that the agreement's application to various claims is "subject to the exclusions in Section 1(A)(ii)," which does not appear on the two pages provided. *Id.* at 2. Without more, I could not conclude definitively that the parties intended to arbitrate the present dispute, because it might

fall within one of the unseen "exclusions."  Nor could I find that the agreement's terms and requirements were sufficiently definite and certain to constitute a valid and enforceable contract under Connecticut law.

But Defendants *have* provided more.  Unlike in *Dreyfuss*, they have produced evidence of a "single standard document containing an arbitration clause," which all employees at the time were required to sign.  349 F. App'x at 552-53.  FGO has submitted a declaration from its manager stating that Clay signed the same standardized arbitration agreement as all other employees hired by Expressway at that time.  ECF No. 23-2 ¶¶ 3, 5.  And it has provided three examples of agreements signed by other employees, all of which are identical to each other and the first and third pages of which are identical to the pages of the document Clay signed.[3]  ECF No. 23-3 at 2-10.  Clay does not deny that his signature appears on the partial copy of the agreement produced by FGO, and he acknowledges that when he was hired, he signed a document without reading it.  ECF No. 29 ¶¶ 15-16.  Defendants have thus presented strong evidence of what was contained on the second, missing page of Clay's agreement.  And this evidence shows that the exclusions in Section 1(A)(ii) were narrow and do not apply to the case at hand.

Clay has not presented any evidence rebutting this showing.  His "failure to recall" the contents of the document "is insufficient to create a genuine dispute of material fact" as to what

---

[3] Clay's argument that Rule 1004 of the Federal Rules of Evidence bars me from considering the arbitration agreements of the other employees to prove the content of the document he signed, *see* ECF No. 28 at 11, fails based on the language of the Rule.  Rule 1004(a) provides that evidence other than an original is admissible to prove the content of a writing if the original is lost or destroyed and not by the proponent of the evidence acting in bad faith.  The declaration from FGO's manager states that, after review of the company files, the manager was able to locate only the first and third pages of the document Clay signed.  (The manager speculates Clay "may have returned only the first and third pages.")  ECF No. 23-1 ¶ 4.  As Clay has not produced the second page, this is adequate evidence that the original has been lost or destroyed.  *See* Fed. R. Evid. 1004(c).  And Clay has offered no evidence that FGO lost or destroyed the original in bad faith, nor would it be reasonable to draw that inference from the evidence in the record.

was contained in that document.  *Reynolds v. Quiros*, No. 3:21-cv-1064, 2024 WL 1241874, at

\*6 (D. Conn. Mar. 22, 2024) (internal quotation marks omitted).  Because there is no genuine

dispute as to the terms of the arbitration agreement Clay signed, I conclude that a valid

agreement was formed under Connecticut law.[4]

### B.  Section 1 of the FAA & Connecticut Law

The parties next dispute whether the agreement falls within an exemption from

mandatory arbitration in the FAA and, if so, whether Connecticut law nonetheless requires

arbitration.  Specifically, Clay argues that he is exempt from arbitration under § 1 of the FAA,

while Defendants contend that § 1 of the FAA does not apply to Clay and, even if it did, he

would still be bound by the arbitration agreement under Connecticut law.  As explained below, I

do not decide the § 1 issue but conclude that Connecticut law would require arbitration here if

not for the EFAA, which I discuss in the next section.[5]

---

[4] It matters not that Expressway did not sign the agreement.  *See Hoye v. DeWolfe Co.*, 61 Conn. App. 558, 563-64 (2001) ("Parties are bound to the terms of a contract even though it is not signed if their assent is otherwise indicated."); *Edwards v. Doordash, Inc.*, No. 16-cv-2255, 2016 WL 7852532, at \*12 (S.D. Tex. Dec. 8, 2016), *report and recommendation adopted*, 2017 WL 244862 (S.D. Tex. Jan. 19, 2017), *aff'd*, 888 F.3d 738 (5th Cir. 2018) ("Defendant manifested its intent to be bound by the agreement through its employment of Plaintiff and acceptance of the agreement from Plaintiff.  The court therefore finds that the arbitration clause is not invalid simply because Defendant did not sign the document.").  Clay does not argue otherwise.  Clay also does not contest Costco's and Soldi's arguments that they are covered by the Arbitration Agreement by its terms and under case law in the Second Circuit.  *See* ECF No. 23-2 at 2 (Arbitration Agreement stating that it applies to Expressway Courier Freight's "clients" and "affiliates.")  The complaint alleges that FGO was Expressway's affiliate and that Costco was FGO's client.  ECF No. 1-1 at 14-15.  *See also Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 127 (2d Cir. 2010).

[5] On April 8, 2024, Clay moved for leave to file a sur-reply "to address new arguments made for the first time by the Defendants in their reply briefs," including their contention "that even if the Plaintiff is exempt from arbitration under the FAA, the Plaintiff must arbitrate his claims under Connecticut law."  ECF No. 36 at 1-2.  I denied this motion, explaining that I would "not consider any arguments raised for the first time in the Defendants' reply briefs."  ECF No. 38.

Defendants' argument that Connecticut law requires arbitration of this dispute was not raised for the first time in their reply brief; FGO's original motion to compel argued that both "federal and Connecticut law" favored arbitration and cited several Connecticut law cases in support of this point.  ECF No. 23-4 at 9-10.  I also subsequently provided Clay with other opportunities to respond to this argument: I issued an order on April 22 directing the parties to file supplemental briefs regarding the motion to compel, ECF No. 39, and allowed Clay to file a response to Defendants' supplemental briefs even though he failed to file one himself, ECF No. 50.  Though

Commonly referred to as the "transportation worker exemption," § 1 of the FAA excludes "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" from the FAA's coverage.  9 U.S.C. § 1.  Courts have consistently held, however, that this provision does not preempt state arbitration law.  *See, e.g.*, *Bissonnette v. LePage Bakeries Park St., LLC*, 49 F.4th 655, 659 (2d Cir. 2022), *vacated and remanded on other grounds*, 601 U.S. 246 (2024) (noting that other Courts of Appeals and multiple courts within the Second Circuit "have rejected the proposition that state arbitration law is preempted when a plaintiff is excluded from the FAA"); *Valdes v. Swift Transp. Co., Inc.*, 292 F. Supp. 2d 524, 529 (2003) ("Section 1 does not…in any way address the enforceability of employment contracts exempt from the FAA. It simply excludes these contracts from FAA coverage entirely."); *Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 595 (3d. Cir. 2004) ("There is no language in the FAA that explicitly preempts the enforcement of state arbitration statutes.").  Accordingly, "the inapplicability of the FAA [under the § 1 exemption] does not render an arbitration [agreement] void when it is otherwise enforceable under state law."  *Islam v. Lyft, Inc.*, 524 F. Supp. 3d 338, 359 (S.D.N.Y. 2021); *see also Smith v. Allstate Power Vac, Inc.*, 482 F. Supp. 3d 40, 48 (E.D.N.Y. Aug. 26, 2020) ("Where the FAA is not applicable, it follows that state arbitration law should be applied…."); *Michel v. Parts Auth., Inc.*, No. 15-cv-5730, 2016 WL 5372797, at *3 (E.D.N.Y. Sept. 26, 2016) ("Even assuming the FAA does not apply, New York state law governing arbitration does apply.").

---

Costco and FGO raised this argument again in their supplemental memoranda, ECF No. 47 at 22; ECF No. 48 at 19-22, Clay did not address it in his reply brief, ECF No. 54.

Nonetheless, in an abundance of caution, I note Clay is free to move to reconsider my ruling on Connecticut arbitration law if he believes that I have overlooked some argument or authority that might change the outcome.  Any motion to reconsider on this or any other issue shall be filed in accordance with, and shall satisfy the standard articulated in, Local Rule 7.

The "Governing Law" provision of the parties' arbitration agreement further supports the conclusion that the agreement is enforceable under Connecticut law even if it falls into the FAA's transportation worker exemption.  That provision specifies that the agreement "shall be governed by the [FAA] *to the extent it is applicable* and otherwise…shall be governed by and construed in accordance with the laws of the state where Employee is or was employed."  ECF No. 23-2 at 3 (emphasis added).  Thus, even if the FAA does not apply because of the transportation worker exemption, Connecticut arbitration law applies.

Because Clay signed the arbitration agreement in November 2019, it is governed by Connecticut's Revised Uniform Arbitration Act ("RUAA").  Conn. Gen. Stat. Ann. § 52-407cc et seq. ("Sections 52-407aa to 52-407eee, inclusive, govern an agreement to arbitrate made on or after October 1, 2018…."); *see also City of Torrington v. Council 4, AFSCME, AFL-CIO, Loc. 442*, 224 Conn. App. 237, 244 (2024) (explaining that "[t]he General Assembly enacted [the RUAA] in 2018 to govern arbitration agreements made on or after October 1, 2018, subject to certain exceptions").  And under the RUAA, "[a]n agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is *valid, enforceable and irrevocable, except upon a ground that exists at law or in equity for the revocation of a contract*."  § 52-407ff(a) (emphasis added).

Clay has not raised and the Court has not identified any such grounds.  Clay's claims that he did not read the agreement and would not have signed it had he understood it are unavailing as Connecticut law "ordinarily holds all competent adults responsible for the contents of the documents they sign, whether they read the documents or not, whether they understand them or not."  *RCS Recovery Servs., LLC v. Lennon, N*o. NNHCV126034520, 2016 WL 4253350, at *5 (Conn. Super. Ct. July 8, 2016); *see also Phoenix Leasing, Inc. v. Kosinski*, 47 Conn. App. 650,

654 (1998) ("The general rule is that where a person of mature years and who can read and write, signs or accepts a formal written contract affecting his pecuniary interests, it is that person's duty to read it and notice of its contents will be imputed to that person if that person negligently fails to do so." (alterations and internal quotation marks omitted)).  Accordingly, I conclude that Clay is bound by the arbitration agreement regardless of whether or not the FAA's transportation worker exception applies.  Since I need not reach the FAA § 1 issue, I turn next to the question of whether Clay's claims are exempt from arbitration under the EFAA.

### C.  The EFAA

The EFAA provides that, "at the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute,…no predispute arbitration agreement…shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute."  Pub. L. No. 117-90, 136 Stat. 26 (2022) (codified at 9 U.S.C. §§ 401–402).  The law was enacted on March 3, 2022 and applies "with respect to any dispute or claim that arises or accrues on or after" that date. Pub. L. No. 117-90, § 3, 136 Stat. at 28.  Clay contends that the EFAA applies to his sexual harassment, hostile work environment, and retaliation claims, and thus exempts from arbitration his entire case.  ECF No. 57 at 3-6.  Defendants contend that the statute does not apply to any of his claims because they did not arise or accrue on or after the EFAA's effective date.  ECF No. 23-4 at 17; *see also* ECF No. 58; ECF No. 61; ECF No. 63.  For the reasons discussed below, I conclude that the EFAA applies to Clay's retaliation claim and makes the parties' arbitration agreement unenforceable as to all claims in this case.

### 1.  <u>The EFAA Applies to Clay's Retaliation Claim</u>

In Clay's initial response to Defendants' motions to compel arbitration, he argues that his sexual harassment claims "did not arise until either November 2022, when he filed his Complaint

with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), or November 2023, when [he] filed his Complaint in the Connecticut Superior Court." ECF No. 28 at 2. He relies primarily on *Famuyide v. Chipotle Mexican Grill, Inc.*, which held that "a dispute comes into being when a person asserts a right, claim, or demand and is met with disagreement on the other side." No. 23-cv-1127, 2023 WL 5651915, at *3 (D. Minn. Aug. 31, 2023), *aff'd*, 111 F.4th 895 (8th Cir. 2024). Defendants note that other courts—including those within this Circuit—have rejected this argument. ECF No. 32 at 9-10; ECF No. 33 at 10-11; ECF No. 35 at 8. For example, the court in *Castillo v. Altice USA, Inc.* concluded that "a dispute arises when the conduct which constitutes the alleged sexual assault or sexual harassment occurs." 698 F. Supp. 3d 652, 656-57 (S.D.N.Y. 2023) (internal quotation marks and alterations omitted). I need not resolve this dispute because even if I adopted Defendants' preferred interpretation of "dispute," I would conclude that the EFAA bars arbitration here, for the reasons discussed below.

While Defendants' motions to compel arbitration were pending, the Second Circuit issued a ruling regarding claim accrual under the EFAA. *Olivieri v. Stifle, Nicolaus & Co., Inc.*, 112 F.4th 74 (2d Cir. 2024). The plaintiff in *Olivieri* alleged that she was sexually harassed by her supervisor from June 2018 to September 2020 and that her employer retaliated against her after she complained in September and October 2020, including by transferring her to another office and passing her over for various promotions. *Id.* at 77-82. She left for maternity leave in October 2021 and returned to the company on March 10, 2022—one week after the EFAA's effective date. *Id.* at 82. Upon her return, the defendants allegedly continued to engage in retaliatory acts—including "purposely le[aving her] out of meetings and ke[eping her] in the dark about company news, including early dismissals"; "depart[ing] from [the company's]

ordinary practice [by] dock[ing] her PTO in 15-minute increments when she stepped away from her desk for a doctor's appointment"; and continuing a "persistent pattern of changing her role in response to her complaints of sexual harassment and misconduct." *Id.* at 92.

The Second Circuit explained that "the term 'accrue' means the same thing under the EFAA as it does in the statute-of-limitations context." *Id.* at 78.  Most claims are subject "to the normal knew-or-should-have-known accrual date." *Id.* at 88.  But claims that are "composed of a series of separate acts that collectively constitute one unlawful practice"—like hostile work environment claims—are subject to the continuing violation doctrine, which "lays out an alternative framework for evaluating accrual." *Id.* (alteration and internal quotation marks omitted).  These claims "accrue and reaccrue with each successive act that is part of the singular unlawful practice." *Id.* at 88.  The Second Circuit concluded that the retaliatory conduct that Olivieri allegedly experienced after returning from maternity leave was "similar in kind to the retaliatory conduct she experienced before her leave, such that it [was] part of the same course of discriminatory conduct [underlying] her retaliation-based hostile work environment claims." *Id.* at 92 (alteration and internal quotation marks omitted).  Accordingly, it held that her retaliation-based hostile work environment claims accrued after the EFAA's effective date and affirmed the district court's order denying the motion to compel arbitration.  *Id.*

As noted, the parties have submitted supplemental briefs addressing *Olivieri*.  Defendants argue that *Olivieri* is distinguishable from the present case, *see* ECF No. 58; ECF No. 61; ECF No. 63, while Clay contends that—like the retaliation-based hostile work environment claim in *Olivieri*—"the last act alleged in furtherance of [his sexual harassment, hostile work environment, and retaliation claims] occurred…after the EFAA was enacted," ECF No. 57 at 3.

Clay's argument fails as to his sexual harassment claim and hostile work environment claims. These claims are "[b]ased upon the conduct of…Soldi and executives at Defendants FGO and COSTCO who condoned Soldi's words and actions," as well as his employer's failure "to protect him from this pervasive harassment" despite his complaints. ECF No. 1-1 ¶¶ 32, 34, 35. This discriminatory conduct predated the EFAA—Soldi was terminated by Costco on November 4, 2021, and the last alleged act of harassment by Soldi occurred on November 30, 2021. *Id.* ¶¶ 16.47, 16.50. Though Clay alleges that "he was fired in retaliation for complaining about the hostile work environment and discrimination he experienced" in April 2022—after the EFAA's effective date—this post-EFAA conduct is not "similar in kind" to the pre-EFAA conduct that forms the basis of these claims. Because the retaliatory conduct that Clay alleges occurred after the EFAA's effective date cannot be said to be a part of the "same course of discriminatory conduct" as his pre-EFAA allegations, Clay's hostile work environment and sexual harassment claims did not accrue after the EFAA's effective date.

But Clay's retaliation claim did. The potentially retaliatory conduct on which this claim is based is his termination from FGO on April 29, 2022—two months after the EFAA's effective date. ECF No. 1-1 ¶¶ 19, 21, 38. And the Second Circuit in *Olivieri* made clear that claims of retaliation resulting from a report of sexual harassment are "sexual harassment disputes" as defined by the EFAA:

> The EFAA defines a "sexual harassment dispute" as "a dispute *relating* to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." 9 U.S.C. § 401(4) (emphasis added). This Court has recognized that retaliation for reporting discrimination is reasonably related to the underlying discrimination, such that a plaintiff who exhausts a discrimination claim with the EEOC may also pursue a claim for retaliation. *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (internal quotation marks and citation omitted). Under similar reasoning, retaliation resulting from a report of sexual harassment is "relat[ed] to conduct that is alleged to constitute sexual

harassment." 9 U.S.C. § 401(4); *see Johnson*, 657 F. Supp. 3d at 551 n.13, 559 (reaching same conclusion).

112 F.4th at 92.[6]

Though Clay's retaliation claim may be "intertwined" with his sexual harassment and hostile work environment claims, it is a "separate and independent cause[] of action." *Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 192 (D. Conn. 2000). Thus, the EFAA applies to his retaliation claim even though the other two claims accrued before March 3, 2022. *See, e.g.*, *Molchanoff v. SOLV Energy, LLC*, No. 23-cv-653, 2024 WL 899384, at *3-4 (S.D. Cal. Mar. 1, 2024) (concluding that the EFAA did not apply to plaintiff's sexual assault claim but did apply to her retaliation claim based on her complaints of sexual assault); *see also Miner,* 126 F. Supp. 2d at 192. ("[W]here, as here, [a plaintiff] has alleged retaliatory acts within the limitations period, [she may] proceed with a retaliation claim even if she is unable to allege or establish claims of sexual harassment within the limitations period."). I conclude that the EFAA applies to Clay's retaliation claim but not his sexual harassment and hostile work environment claims.[7]

---

[6] FGO contends that Clay's retaliation claim relates to his complaints about FGO's racially discriminatory pay practices, not his complaints of sexual harassment. ECF No. 23-4 at 19; ECF No. 63 at 6. It asserts that "Plaintiff has not alleged, and in fact cannot allege, that his termination was related to the alleged sexual harassment." *Id*. But Clay *has* so alleged. Though he claims that he was underpaid due to his race, he contends that his *termination* was "in retaliation for complaining about the racial *and sexual harassment* he experienced," as well as his complaints regarding his compensation. ECF No. 1-1 ¶¶ 19, 21 (emphasis added). That Clay's retaliation claim is related to both his sexual harassment and racial discrimination complaints does not remove it from the EFAA's ambit. "So long as the substance of the factual allegations supporting a claim can be fairly characterized, *at least in part*, as alleged sexual harassment violations, the party bringing that claim may invoke the EFAA to invalidate an otherwise enforceable arbitration agreement." *Newton v. LVMH Moet Hennessy Louis Vuitton Inc.*, No. 23-cv-10753, 2024 WL 3925757, at *7 (S.D.N.Y. Aug. 23, 2024) (internal quotation marks omitted) (emphasis added).

[7] The EFAA applies "with respect to any dispute or claim that arises *or* accrues on or after" its effective date. Pub. L. No. 117-90, § 3, 136 Stat. at 28 (emphasis added). And, as discussed below, its application to one claim exempts the entire case from arbitration. Accordingly, I need not determine whether some or all of Clay's claims "arose" after the EFAA's effective date.

## 2.  __The EFAA Exempts from Arbitration Clay's Entire Case__

As Clay notes, because the operative language of the EFAA provides that no arbitration

agreement "shall be valid or enforceable with respect to a *case* which…relates to [a]…sexual

harassment dispute," 9 U.S.C. § 402(a) (emphasis added), courts in this Circuit have held that the

EFAA's "invalidation of an arbitration agreement extends to the entirety of the case relating to

the sexual harassment dispute, not merely the discrete claims in that case that themselves either

allege such harassment or relate to a sexual harassment dispute." *Johnson v. Everyrealm, Inc.*,

657 F. Supp. 3d 535, 559 (S.D.N.Y. 2023) (internal quotation marks omitted).  Thus, "where a

dispute presents multiple claims—some related to sexual harassment, others not—the EFAA

blocks arbitration of the entire case, not just the sexual harassment claims." *Delo v. Paul Taylor

Dance Foundation, Inc.*, 685 F. Supp. 3d 173, 180 (S.D.N.Y. 2023).

Though I find the reasoning in these cases persuasive, this case differs from *Johnson* and

*Delo* in two significant ways.  First, it presents multiple claims related to sexual harassment—

only one of which accrued after the EFAA's enactment date—*as well as* claims not related to

sexual harassment.  Second, the only claim to which the EFAA applies pertains to only one of

the three defendants.

At least one court has applied *Johnson*'s reasoning to such a fact pattern.  *See Molchanoff*

2024 WL 899384, at *3-4.  The plaintiff in *Molchanoff* was sexually assaulted by a supervisor

while working on a project on the site of her employer's client ("former client").  *Id.* at *1.  After

reporting her assault to her direct supervisor and law enforcement, she was terminated by her

employer and the former client.  *Id.*  In December 2021, the former client was sold, and a new

entity retained the project's management team.  *Id.*  Plaintiff applied to work at another project

site run by this new entity in June 2022.  *Id.*  She received a job offer, but it was rescinded after

one of the managers from her former project learned that she had been hired.  *Id.*  Plaintiff raised

sexual harassment, retaliation, and other related claims against, among others, the former client

and the new entity that had rescinded her job offer.  *Id.* at *2.  She argued that each of these

claims accrued or arose after the EFAA's effective date.  *Id.* at *3.  The court disagreed and

found that the EFAA applied only to her retaliation claim against the new entity.  *Id.* at *3-*4.

Nonetheless, the *Molchanoff* court concluded that "the EFAA bar[red] enforcement of the

arbitration agreement…as to all claims in th[e] case, and as to all Defendants."  *Id.* at *5.  It

rejected the defendants' argument that "the EFAA [could ]not bar arbitration of…[the] claims

[that accrued pre-EFAA] because the statutory note to the Act clearly delineates applicability to

claims or disputes that arise or accrue after the enactment date of the EFAA":

> [T]he text of the EFAA is plain and unambiguous in that, "at the election of the
> person alleging conduct constituting a sexual harassment dispute or sexual assault
> dispute,…no predispute arbitration agreement…shall be valid or enforceable with
> respect to a *case* which is filed under Federal, Tribal, or State law *and relates to
> the*…sexual harassment *dispute*."  The ordinary interpretation of "case" is a
> proceeding which may encompass many claims or disputes.…On the other hand,
> a claim is "a statement that something yet to be proved is true" or "the assertion of
> an existing right; any right to payment or to an equitable remedy, even if
> contingent or provisional." Similarly, a dispute is "a conflict or controversy, esp.
> one that has given rise to a particular lawsuit."…In other words, the EFAA keys
> the scope of the invalidation of the arbitration clause to the entire 'case' relating
> to the sexual harassment dispute and thus does not limit the invalidation to the
> claim or claims in which that dispute plays a part.

*Id.* at *4 (citations, alterations, and some internal quotation marks omitted).  The court also

agreed with the *Johnson* court that " 'Congress's choice to amend the FAA directly with text

broadly blocking enforcement of an arbitration clause with respect to an entire "case" "relating

to" a sexual harassment dispute reflects its rejection…of the FAA norm of allowing individual

claims in a lawsuit to be parceled out to arbitrators or courts depending on each claim's arbitrability.' " *Id.* at *4-*5 (quoting *Johnson*, 657 F. Supp. 3d at 562).

I agree with and adopt the *Molchanoff* court's reasoning.  While it is true that the effective date provision of the EFAA states that "[t]his Act, and the amendments made by this Act, shall apply with respect to any *dispute or claim* that arises or accrues" on or after March 3, 2022, Pub. L. No. 117-90, § 3, 136 Stat. at 28 (emphasis added), the "Act," and its amendments to the FAA, make the rule of invalidity applicable "to a case," 9 U.S.C. § 402(a), not a "dispute" or "claim."  When a covered "dispute" or "claim" arises or accrues after March 3, 2022, therefore, any arbitration agreement that would otherwise govern that dispute or claim may be invalidated with respect to all claims in the case by the person alleging the covered dispute or claim.

This reading of the EFAA also fits with "Congress's intent to override—in the sexual harassment context—the FAA's background principle that, in cases involving both arbitrable and non-arbitral claims, the former must be sent to arbitration even if this will lead to piecemeal litigation." *Johnson*, 657 F. Supp. 3d at 560 (internal quotation marks omitted).  The EFAA's holistic application to "case[s]" applies across the board.  It is difficult to see why Congress would have chosen to invalidate a category of arbitration agreements for the entire case whenever only one of multiple claims was covered by the statute due to subject matter but not whenever only one of multiple claims was covered by the statute due to date of accrual.  And just as a "case" might involve multiple claims, it also might involve multiple parties, including parties against whom no claims covered by the statute are asserted.  As long as the claims and parties are properly joined—and no party here suggests otherwise—then when a claim against one party is covered by the EFAA, the entire case cannot be arbitrated if the plaintiff so elects.

Because Clay's retaliation claim is a sexual harassment dispute, and because the case as a whole relates to that dispute, I conclude that the EFAA bars enforcement of the arbitration agreement as to Clay's entire case.

## I.    CONCLUSION

In sum, though the parties formed an arbitration agreement that is enforceable under Connecticut law, the agreement is unenforceable at Clay's election under the EFAA.  I must thus DENY Defendants' Motions to Compel Arbitration, ECF No. 23; ECF No. 24; ECF No. 25. Because Defendants have reserved the right to file motions to dismiss, ECF No. 23-4 at 19 n.5; ECF No. 24-1 at 16 n.6, and because the EFAA applies to only *plausibly* pled sexual harassment disputes, *Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563, 577, 583-88 (S.D.N.Y. 2023), however, I deny these motions without prejudice to refiling if FGO successfully moves to dismiss Clay's retaliation claim.  Discovery in this case will remain stayed until I decide any motion to dismiss FGO might file as to the retaliation claim.  If FGO files such a motion, I will consider the Defendants' motions to compel arbitration to be renewed and expect to decide them based on the outcome of the motion to dismiss.  The parties may not otherwise file further briefs with respect to the motion to compel arbitration, except any notices of cases decided after this ruling relating to the issues discussed in this decision.  Any defendant who wishes to file a motion to dismiss any claim in this case must do so within **45 days** of this order, i.e., by **November 11, 2024**.


IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut

September 27, 2024